OLIVIER MISIGARO,                              Civil Action No. 1:26-cv-10298-IT

    Petitioner,

v.

CHRISTOPHER BRACKETT, et al.,

    Respondents.

**PETITIONER'S REPLY TO RESPONDENTS' RESPONSE TO ORDER TO SHOW
CAUSE AND NOTICE OF INTENT TO TRANSFER FOR PURPOSE OF REMOVAL**

Petitioner Olivier Misigaro submits this reply to Respondents' Response to the Court's Order to Show Cause and Notice of Intent to Transfer for Purpose of Removal, Doc. 16, and in further support of the emergency relief requested in his amended petition and emergency motion. Respondents' filing answers one question while raising a more urgent one. It confirms that ICE re-detained Mr. Misigaro not because he violated the terms of supervision, not because detention is needed to obtain a travel document, and not because an Immigration Judge or any neutral adjudicator has found Cameroon lawful as a country of removal. ICE detained him because it intends to put him on a charter flight to Cameroon under the March 30, 2025 third-country-removal Guidance, despite his expressed fear, despite his pending claims for withholding of removal and protection under the Convention Against Torture, despite new evidence that Cameroon is detaining protected third-country deportees and forcing them toward return to their countries of persecution, and despite ICE's own request that USCIS cancel the fear interview scheduled to consider his claim. That is not a lawful changed circumstance under *Zadvydas v. Davis*, 533 U.S. 678 (2001), *Kong v. United States*, 62 F.4th 608 (1st Cir. 2023), 8 C.F.R. § 241.13(i), or due process. It is a planned unlawful rendition. *Zadvydas* permits detention only for the period reasonably necessary to accomplish removal. After the presumptively reasonable period has passed, and especially after

1

court-ordered supervised release, the government must show a significant likelihood of lawful removal in the reasonably foreseeable future. A manifest, a charter flight, and generalized diplomatic assurances cannot make removal reasonably foreseeable when the government has not completed the legal process required to determine whether Cameroon is a lawful destination for this particular person.

Respondents also overread the jurisdiction-stripping provisions they cite. Mr. Misigaro does not ask this Court to review, reopen, or vacate the final removal order. That order specifies Rwanda, and his removal to Rwanda was withheld. He challenges his renewed detention, ICE's revocation of court-ordered supervised release, and Respondents' new post-order protocols that exist outside removal proceedings for sending him to Cameroon without the process required by 8 U.S.C. §§ 1231(b)(2) and 1231(b)(3), the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), the CAT regulations, and the Fifth Amendment. Those claims are independent of the removal proceedings that produced the final removal order. They are also at the core of habeas: a person in federal custody asks a court to decide whether the Executive may continue to hold him and use that detention to place him beyond meaningful judicial review.

If Respondents were correct that 8 U.S.C. § 1252(g) bars this Court from preserving the status quo until it can decide those claims, the consequences would be grave. ICE could take a person whom a federal court ordered released, re-detain him at a supervision check-in, cancel the fear screening triggered by his expressed fear, transfer him outside the practical reach of the habeas court, remove him to a country not named in the removal order, fail to follow the statutory sequence for designating a third country, and do all of that without any court ever being able to review the legality of the detention or the legal machinery that made the removal possible. The

Suspension Clause does not tolerate that kind of jurisdictional black hole, and ordinary canons of construction do not require it.

## BACKGROUND

This Court ordered Mr. Misigaro released under supervision on February 6, 2026 because Respondents had not produced evidence that his removal was significantly likely in the reasonably foreseeable future. ICE then released him under an Order of Supervision. On April 22, 2026, ICE directed him to report for what the notice described as BI SmartLink enrollment but detained him on arrival and revoked his supervised release. Respondents now assert that circumstances changed because ICE identified Cameroon as a third country of removal. The Anzelmo declaration confirms the essential facts. ICE detained Mr. Misigaro on April 22, 2026; revoked his OSUP under 8 C.F.R. § 241.13(i); identified Cameroon as the intended third country; stated that Mr. Misigaro is manifested for a removal flight to Cameroon; asserted that no travel document is needed because Cameroon's acceptance and the manifest serve as the travel document; acknowledged that Mr. Misigaro, through counsel, expressed fear of removal to Cameroon; and stated that ICE intended to remove him on April 28, 2026 absent court relief. Anzelmo Decl., ECF No. 16_1 ¶¶ 16-24.

Respondents' filing also confirms that ICE intends to rely on the March 30, 2025 Guidance Regarding Third Country Removals, Doc. 16 at 3, the same Guidance challenged in *D.V.D. v. U.S. Department of Homeland Security*. Under that Guidance, where DHS claims that a receiving country has provided diplomatic assurances accepted by the State Department, the noncitizen receives no meaningful individualized process. Where the Guidance does permit a fear process, it places the onus on the noncitizen's spontaneous expression of fear and requires ultra-compressed timelines that make reasoned consideration of protection claims nearly impossible.

Here, Petitioner did express fear. Because his English is limited, it is unclear whether he was able to convey his fear directly to ICE officers, but counsel also submitted a letter to ICE on his behalf. Based on this information, USCIS scheduled a fear interview for April 24, 2026, at 4:00 p.m. Counsel confirmed availability and submitted country-condition reports and expert evidence. USCIS then informed counsel that it was prepared to conduct the interview, but ICE requested that it be canceled. Respondents cannot cancel the process that would determine whether Cameroon is legally available and then invoke a planned removal to Cameroon as the changed circumstance making detention lawful.

The existing removal order does not designate Cameroon. The Immigration Court's final order specified Rwanda. The same order withheld removal to Rwanda. Thus, Respondents are not executing the removal order as entered. Nor are they following the process for selecting an alternative country for removal. They are attempting to concoct, outside the removal proceeding, a separate third-country transfer process that would deliver Petitioner to a country in which he has no citizenship, no residence, no family, no legal status, no community, and no protection from Rwanda's transnational repression apparatus or from chain refoulement back to Rwanda.

Petitioner has also filed an emergency motion to reopen and stay removal in the removal proceedings so the Immigration Court can adjudicate his country-specific claims for withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT protection as to Cameroon. That administrative filing does not convert this habeas case into a petition for review. It underscores why interim habeas relief is necessary: Respondents seek to remove Petitioner before the tribunal that entered the country-specific order can address claims pertaining to the new country they selected after the removal proceedings ended.

**ARGUMENT**

**I. Respondents have not shown that lawful removal to Cameroon is significantly likely in the reasonably foreseeable future.**

The controlling question is not whether ICE can physically move Mr. Misigaro onto an aircraft. It is whether removal can lawfully be effectuated in the reasonably foreseeable future. *Zadvydas* holds that post-order detention under 8 U.S.C. § 1231(a)(6) is limited to the period reasonably necessary to bring about removal, and once a noncitizen provides good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future, the government must rebut that showing with evidence. 533 U.S. at 699-701. *Kong* confirms that when ICE re-detains a person previously released under supervision, ICE must comply with its own regulations and make an individualized determination that, based on changed circumstances, removal has become significantly likely in the reasonably foreseeable future. 62 F.4th at 619-20.

Respondents' asserted flight manifest is not enough. A plan to remove a person through legally defective procedures does not give rise to the foreseeability needed to detain him. ICE's theory would collapse the distinction between lawful removal and physical expulsion. On that theory, the government could always satisfy *Zadvydas* by arranging an unlawful flight. *Zadvydas* does not permit detention to become a holding pen for ultra vires government conduct.

The required process is for selecting a third country is sequential. Before Respondents may lawfully send Petitioner to Cameroon, they must pass through the following steps.

Step One: identify and apply the correct country-selection statute. Respondents cite 8 U.S.C. § 1231(b)(1)(C), Doc. 16 at 3, but Mr. Misigaro was admitted to the United States as a B-2 visitor and was ordered removed as an overstay under 8 U.S.C. § 1227(a)(1)(B). He is not an arriving alien being removed under the arriving-alien country-selection provision. For him, the operative statute is 8 U.S.C. § 1231(b)(2). This provision imposes additional requirements for designating a third country.

Step Two: follow the statutory hierarchy in 8 U.S.C. § 1231(b)(2). *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005), describes that provision as a sequence of country-selection commands. *D.V.D. v. U.S. Department of Homeland Security*, 2026 WL 521557, likewise held that 8 U.S.C. § 1231(b)(2) does not allow DHS to leap to any willing country whenever doing so is convenient. Because Rwanda is the country named in the order and removal to Rwanda has been withheld under 8 U.S.C. § 1231(b)(3), Respondents must show how each prior statutory option is unavailable before invoking the last-resort willing-country provision, 8 U.S.C. § 1231(b)(2)(E)(vii), for Cameroon, a country with no connection to Petitioner.[1]

Step Three: give meaningful written notice to Petitioner and counsel. That notice must identify Cameroon, the statutory basis for its designation, the alleged basis for Cameroon's acceptance, the assurances on which Respondents rely, and enough information about the planned transfer or removal to permit a meaningful response. Last-minute notice that merely announces a country and a flight is not a meaningful opportunity to be heard.

Step Four: affirmatively inquire into fear and create a written record. The government may not place the burden on a detained, limited-English noncitizen to spontaneously express fear in the

---

[1] The sequence is specified in the statute as follows: **C) Disregarding designation** The Attorney General may disregard a designation under subparagraph (A)(i) if--**(i)** the alien fails to designate a country promptly;**(ii)** the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country; **(iii)** the government of the country is not willing to accept the alien into the country; or**(iv)** the Attorney General decides that removing the alien to the country is prejudicial to the United States.**(D) Alternative country** If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country--**(i)** does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or**(ii)** is not willing to accept the alien into the country.**(E) Additional removal countries** If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:**(i)** The country from which the alien was admitted to the United States.**(ii)** The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.**(iii)** A country in which the alien resided before the alien entered the country from which the alien entered the United States. 8 U.S.C. § 1231(b)(2)

few hours between notice and removal. At minimum, the officer must ask whether Petitioner fears persecution, torture, detention, or onward return if sent to Cameroon; memorialize the answer; notify counsel; and provide interpretation and a realistic opportunity to submit evidence. Here, counsel did express fear, USCIS scheduled an interview, and ICE canceled it.

Step Five: conduct an individualized protection determination before removal. The government must decide whether Petitioner's life or freedom would be threatened in Cameroon under 8 U.S.C. § 1231(b)(3)(A); whether he would more likely than not be tortured there under FARRA and the CAT regulations; and whether Cameroon is likely to detain him indefinitely or return him to Rwanda in violation of nonrefoulement. That determination must consider Petitioner's own evidence, including post-assurance evidence and the risk that Rwandan state actors can reach him in Cameroon.

Step Six: preserve review and reopening procedures before physical removal. If the screening is adverse, Petitioner must have a meaningful opportunity to seek review and reopening before he is placed outside the United States. *Kumar v. Wamsley* required adequate preparation time before a fear interview and fifteen days after an adverse determination to move to reopen. 2025 WL 3204724, at *8-9. The same logic applies here, where the Immigration Court has been asked to adjudicate Cameroon-specific withholding and CAT claims that could not have been raised before Cameroon was disclosed.

Respondents have not carried out these steps. They have cited the wrong country-selection subsection; produced no analysis under 8 U.S.C. § 1231(b)(2); relied on generalized assurances that predate contrary evidence; failed to provide meaningful notice and counsel-assisted process; and, most tellingly, requested cancellation of the very fear interview that would have tested

whether Cameroon is legally available. That is not a significant likelihood of lawful removal in the reasonably foreseeable future.

Nor does *Johnson v. Guzman Chavez* authorize removal without these steps. *Johnson* recognizes that withholding is country-specific and that DHS may remove a person to a lawful third country other than the country as to which withholding has been granted. 594 U.S. 523, 531-36 (2021). But *Johnson* did not hold that DHS may disregard mandatory withholding, CAT, FARRA, due-process, or country-selection requirements for the new destination. The statutory bar applies to the actual country of removal. 8 U.S.C. § 1231(b)(3)(A) provides that the government may not remove a person to a country where his life or freedom would be threatened on a protected ground. FARRA and the CAT regulations likewise forbid removal where a person faces torture. Those protections would be empty if DHS could avoid them by naming a new country after the removal proceeding has ended and removing the person before he can be heard as to that country.

Longstanding immigration authority confirms that a new country triggers a new opportunity to assert country-specific protection. *Matter of A-S-M-*, 28 I. & N. Dec. 282 (B.I.A. 2021), recognizes that a noncitizen may seek withholding as to any country to which DHS states it may remove him. *Matter of Anunciacion*, 12 I. & N. Dec. 815, 818 (B.I.A. 1968), likewise recognized, using the removal-proceedings term respondent, that if the originally specified country will not accept the respondent and proceedings are reopened to designate another country, the respondent has the right to assert that he would face persecution if deported to that newly specified country. *Aden v. Nielsen* applied the same principle in habeas, holding that when DHS designates a country outside the original removal proceeding, due process requires sufficient notice and a meaningful opportunity to pursue withholding or other fear-based protection as to that country. 409 F. Supp. 3d 998, 1018-19 (W.D. Wash. 2019).

The process Respondents intend to use is also the process courts have repeatedly found unlawful. *D.V.D. v. U.S. Department of Homeland Security*, 778 F. Supp. 3d 355 (D. Mass. 2025), required meaningful notice and an opportunity to raise fear-based claims before third-country removal. *D.V.D. v. U.S. Department of Homeland Security*, 2026 WL 521557 (D. Mass. Feb. 25, 2026), later vacated the March Guidance on the merits as contrary to 8 U.S.C. § 1231(b)(2), 8 U.S.C. § 1231(b)(3), and due process. Although classwide injunctive relief has been stayed pending appeal, the stay did not bless the Guidance or bar individual habeas relief. *Kumar v. Wamsley*, 2025 WL 3204724 (W.D. Wash. Nov. 17, 2025), granted individual habeas relief notwithstanding *D.V.D.* class membership and the Supreme Court's stay, holding that the same third-country policy deprived the petitioner of notice and an opportunity to be heard. *Kumar* ordered individualized protections, including adequate time to prepare for a fear interview and fifteen days after an adverse determination to seek reopening. Id. at *8-9. Other courts have required similar safeguards: written notice of the designated country and statutory basis, affirmative inquiry about fear, written memorialization, notice to counsel, meaningful preparation time, counsel access, and Immigration Judge review or reopening procedures. See *Aden*, 409 F. Supp. 3d at 1018-19; *Nguyen v. Scott*, 796 F. Supp. 3d 703 (W.D. Wash. 2025); *Sagastizado v. Noem*, 802 F. Supp. 3d 992 (S.D. Tex. 2025); *Gomez v. Mattos*, 2025 WL 3101994 (D. Nev. Nov. 6, 2025); *Elshourbagy v. Bondi*, 2025 WL 3718993 (W.D. Wash. Dec. 23, 2025).

This case presents an even plainer as-applied violation. After ICE was aware of Petitioner's fear of removal to Cameroon, ICE did not merely provide too little time for a fear interview. USCIS scheduled the interview, counsel submitted evidence, and ICE asked USCIS to cancel it. ICE did not merely rely on general assurances. It seeks to rely on assurances that predate significant contrary evidence that Cameroon is detaining protected U.S. deportees and pressuring or forcing

them toward their countries of origin. A lawful removal cannot be reasonably foreseeable when the agency is affirmatively preventing the screening that would determine whether removal is lawful.

Mr. Misigaro is at severe risk of indefinite detention and refoulement to Rwanda if sent to Cameroon, as information on the Cameroonian government's treatment of third-country deportees sent by the United States demonstrates. This information is new, based entirely on events that have transpired since the Department of State's January 7 evaluation of Cameroon's diplomatic assurances. See Anzelmo Decl. ¶ 22. It makes clear that Mr. Misigaro's deportation to Cameroon would be flatly in violation of prohibitions on nonrefoulement and that, consequently, his motion to reopen and efforts to halt his deportation to Cameroon are likely to succeed.

Since the January 7 evaluation of the diplomatic assurances, the United States has deported at least 17 migrants to Cameroon, "almost all" of whom—like Mr. Misigaro—had been granted legal protections from removal to their countries of origin by immigration judges in the United States. N.Y. Times, IN SECRET DEPORTATION DEAL, U.S. LEVERAGED FAVORS AND FUNDS (Mar. 25, 2026), https://www.nytimes.com/2026/03/25/world/africa/in-secret-deportation-deal-us-leveraged-favors-and-funds.html. Cameroon has detained most if not all of them in a government detention center. Id.; N.Y. Times, U.S. DEPORTS NINE MIGRANTS IN SECRET, IGNORING LEGAL PROTECTIONS (Feb. 16, 2026), https://www.nytimes.com/2026/02/14/world/africa/us-secret-deportation-cameroon.html.

While detaining these people who, like Mr. Misigaro, received legal protections in the United States from removal to their countries of origin, the Cameroonian government has plainly told them that they cannot stay in Cameroon and will be sent to their countries of origin. In February, deportees from the U.S. to Cameroon and their lawyers reported that they had been

detained since arrival in Cameroon and that Cameroonian officials informed them that "they cannot leave the facility unless they agree to return to their home countries." N.Y. Times, U.S. DEPORTS NINE MIGRANTS IN SECRET. A video obtained by the New York Times confirms that the Cameroonian government is requiring individuals with U.S. protection from removal to their countries of origin to return there. A Cameroonian foreign office official told the deportees from the United States in March: "You are going back to your country. The new U.S. government has a policy, and they will do everything to deliver on that." N.Y. Times, IN SECRET DEPORTATION DEAL, U.S. LEVERAGED FAVORS AND FUNDS.

As of February, at least one person with protections from refoulement had been coerced under this policy of indefinite detention and ultimate refoulement to return: the total may well be higher now. N.Y. Times, U.S. DEPORTS NINE MIGRANTS IN SECRET; Associated Press, THE US DEPORTED A GAY ASYLUM-SEEKER TO A THIRD COUNTRY WHERE HOMOSEXUALITY IS ILLEGAL (Feb. 22, 2026), https://apnews.com/article/trump-deportation-cameroon-morocco-lgbt-interview-1ea278f4c981df798773e26972c5d54f ; see also N.Y. Times, TRUMP WANTS TO MAKE DEPORTATION DEALS. AUTOCRATS ARE READY TO LISTEN. (Apr. 4, 2026), https://www.nytimes.com/2026/04/04/world/africa/trump-deportation-africa-migrants.html (at least three people sent to countries of origin from Cameroon). More information on the ultimate disposition of third country-deportees sent by the U.S. to Cameroon is not readily publicly available: the Cameroonian government has arrested journalists reporting on their treatment. N.Y. Times, JOURNALISTS ARRESTED IN CAMEROON WHILE REPORTING ON TRUMP'S SECRETIVE DEPORTATION PROGRAM (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/world/africa/cameroon-journalists-arrested-deportees.html.

The Cameroonian government's policy of refoulement contrary to the legal protections granted by U.S. immigration judges is consistent with nearby countries' refoulement of third-country deportees. In Equatorial Guinea, the government has returned 17 third-country deportees to their countries of origin. Associated Press, SECRETIVE DEAL LEAVES DEPORTEES FROM THE US STUCK IN EQUATORIAL GUINEA WITH "NO MORE HOPE" (Mar. 21, 2026), https://apnews.com/article/equatorial-guinea-deportations-trump-asylum-migrants-9d0a623b83288f5c7b1d1a71443d04cd. Authorities told an individual whom the U.S. had granted legal protections that the country had no legal protections for him; they handcuffed another man who had sought asylum and with U.S. legal protections, and put him on a plane to his country of origin. Id. As of January 17, Ghana had sent at least 22 third-country deportees to their countries of origin notwithstanding legal protection. Reuters, GHANA TOOK IN TRUMP'S DEPORTED WEST AFRICANS. THEN IT FORCED THEM HOME (Jan. 17, 2026), https://www.reuters.com/world/africa/ghana-took-trumps-deported-west-africans-then-it-forced-them-home-2026-01-16.

If sent to Cameroon, like others with legal protections sent to Cameroon and nearby African countries, this significant new information makes clear that he is at grave risk of refoulement to Rwanda and, until then, indefinite detention. The information that Cameroon is forcing third-country deportees with protection to choose between refoulement and indefinite detention—and making clear that in any event ultimately they will be refouled—post-dates the U.S. government's January 7 evaluation of Cameroon's diplomatic assurances. But the government is plainly on notice now, particularly in light of detailed reporting and reporters' requests for comment from the government. Thus, Mr. Misigaro's motion to reopen and efforts to stop his deportation to Cameroon are likely to succeed, and removal remains not reasonably foreseeable.

Judge Chutkan's opinion in *D.A. v. Noem* underscores the danger of relying on generalized assurances and post hoc diplomacy after the person is already outside the United States. *D.A.* opened by noting that for more than three decades and through five presidential administrations, the United States adhered to CAT obligations and constitutional due process for persons present in this country. The opinion then described recent third-country removals as a sharp break from that practice: people with protection orders were moved with little or no notice, to countries where they had no ties, and without access to family or counsel. *D.A. v. Noem*, No. 25-cv-3135 (TSC), ECF No. 41 (D.D.C. Sept. 15, 2025). The court noted that those removals appeared to be part of an effort to evade legal obligations by doing indirectly what the government could not do directly. Id. The Ghana assurances did not prevent one protected plaintiff from being sent to the country from which he had CAT protection, and the court was left to conclude that it could not compel Ghana to act. Id. Here, the lesson is immediate. Mr. Misigaro is still in the United States. This Court's hands are not tied unless Respondents are permitted to tie them by transfer and removal before judicial review.

Finally, the individual record makes Cameroon legally unavailable absent meaningful protection proceedings. The expert declaration of Leonce Byimana explains that Mr. Misigaro faces an acute individualized risk in Cameroon because Rwanda's transnational repression apparatus can reach him there, because Cameroon cannot or will not protect him, because Cameroon has its own record of detention and torture, and because Mr. Misigaro has a known profile as a Hutu Rwandan dissident who has publicly criticized the RPF, associated with RNC members, and previously been detained and tortured by Rwandan security forces. This is precisely the sort of individualized evidence the March Guidance suppresses and due process requires the government to consider.

For all these reasons, the government's evidence shows only a significant likelihood of an attempted removal, not a significant likelihood of lawful removal. That is insufficient under *Zadvydas*, *Kong*, and the regulations governing OSUP revocation.

**II. Respondents did not lawfully revoke the Order of Supervision.**

The revocation of Mr. Misigaro's supervised release independently fails. ICE released Mr. Misigaro pursuant to this Court's February 6 order. He appeared as directed for a check-in noticed as BI SmartLink enrollment. Respondents do not identify any violation of the Order of Supervision. They do not claim he obstructed removal, absconded, refused to assist with documents, or posed a new danger. And they affirmatively say no travel document is needed. Anzelmo Decl. ¶ 18. The asserted basis for revocation is only that ICE has identified Cameroon and placed him on a manifest.

That is not the individualized changed-circumstances determination required by 8 C.F.R. § 241.13(i)(2) and *Kong*. It is a conclusion about logistics, not legality. Nor does the informal interview cure the problem. Due process required meaningful notice of the basis for re-detention and a meaningful opportunity to respond, with counsel, before or at least promptly after the deprivation. A perfunctory post-arrest interview cannot substitute for an individualized decision that accounts for counsel's expressed fear, the scheduled fear interview, the evidence submitted, the pending motion to reopen, and the post-assurance evidence of Cameroon refoulement.

The government's interest can be protected through the same supervised release this Court ordered and ICE administered. Respondents have not shown that detention is needed to obtain documents, because they say no document is needed. They have not shown that detention is needed to ensure appearance, because Mr. Misigaro appeared for the very check-in at which he was arrested. They have not shown that detention is needed for public safety, because they identify no

new conduct. The liberty deprivation is large, the risk of error is intolerably high, and the burden of continuing supervision while the Court adjudicates this matter is modest.

**III. This Court has jurisdiction because Petitioner challenges detention and a new third-country process, not the final removal order or the removal proceedings that produced it.**

Respondents rely on 8 U.S.C. § 1252(g) and *Compere v. Riordan*, 368 F. Supp. 3d 164 (D. Mass. 2019), to argue that this Court lacks power to preserve the status quo. That argument misdescribes the claim and the relief. Mr. Misigaro is not challenging the Immigration Judge's finding of removability, the denial of asylum, the grant of withholding to Rwanda, or the finality of the Rwanda order. The only removal order here names Rwanda. Respondents are not attempting to remove him to Rwanda, because the law forbids that removal. They are attempting to impose a new post-order Cameroon process that did not exist in the removal proceedings and that could not have been meaningfully challenged until DHS disclosed the new country.

*Aden* is directly on point. The petitioner there did not challenge the IJ's removability decision or the removal order itself. He challenged ICE's later attempt to designate Somalia after removal to Kenya proved impossible. The district court held that it had habeas jurisdiction because the claims were independent of the final removal order. 409 F. Supp. 3d at 1006. The same is true here. This Court can decide whether ICE may detain Mr. Misigaro and use that detention to carry out an untested third-country removal without reviewing the validity of the Rwanda order.

*D.V.D.* reaches the same jurisdictional conclusion for the policy at issue here. The court held that 8 U.S.C. § 1252(g) did not bar review of the March Guidance because the claims challenged a policy and legal constraints on third-country removals, not the discretionary acts of commencing proceedings, adjudicating cases, or lawfully executing removal orders. *D.V.D.*, 2026 WL 521557. The court also recognized that a noncitizen cannot raise a fear-based claim as to a third country before receiving notice of that country; until then, the claim is hypothetical. Id. That

is exactly why Respondents' channeling argument fails. There was no Cameroon issue to petition for review from the Rwanda order. The government created the Cameroon issue later, outside the proceeding, and now seeks to remove Mr. Misigaro before any forum can adjudicate it.

*Kumar* reinforces the point in the individual habeas posture. The petitioner there, like Mr. Misigaro, had a final order and withholding protection as to his home country, but challenged the proposed third-country removal process as applied to a new country. The court held that the *D.V.D.* class action and the Supreme Court's stay did not preclude individual habeas relief, and it granted relief tailored to the petitioner's own removal. *Kumar*, 2025 WL 3204724, at *6-9. Habeas relief is not limited to immediate physical release; it may also restrain unlawful custody and preserve the meaningful exercise of rights that detention threatens to extinguish. Id.; see also 28 U.S.C. §§ 2241, 2243.

*Quichimbo Sumba v. Edlow* also supports this Court's authority to enter interim relief. The court explained that a motion for preliminary injunction is not itself a jurisdiction-stripping 'claim' under 8 U.S.C. § 1252(g), that a mere but-for relationship with removal is insufficient, and that courts must focus on the action being challenged rather than the practical effect of the requested relief. 2026 WL 630005 (D. Mass. Mar. 5, 2026). The same court recognized that the All Writs Act permits injunctions to preserve jurisdiction where there is a clear relationship between the underlying claims and the threatened injury. Id. Here the relationship is direct. The underlying claims challenge detention and the unlawful Cameroon process. Transfer to Louisiana and removal to Cameroon would frustrate this Court's habeas jurisdiction and may render any final relief illusory.

*Ercelik v. Hyde* likewise rejects a categorical reading of immigration jurisdiction bars in the detention context. 2025 WL 1361543 (D. Mass. May 8, 2025). The court emphasized that 28

U.S.C. § 2241 authorizes review of custody in violation of the Constitution and laws of the United States, that jurisdiction-stripping provisions must be read carefully, and that constitutional detention claims remain reviewable absent a clear statement to the contrary. Id. The court ordered interim release and restrained further detention pending proceedings unless the government first provided notice to the court and counsel. Id. Similar relief is appropriate here, where the Court has already ordered supervised release and ICE's renewed detention is the mechanism by which Respondents seek to defeat review.

*Compere* does not control. *Compere* involved a district-court request to stay a final order of removal. Mr. Misigaro does not ask the Court to review or stay the Rwanda order as such. He asks the Court to prevent Respondents from using unlawful detention and an unlawful third-country process to remove him to Cameroon, a country not named in the order, before he can obtain the process the Constitution and statutes require. 8 U.S.C. § 1252(g) does not give the Executive discretion to violate a court order, disregard mandatory statutes and regulations, cancel protection procedures, or remove a person through an ultra vires policy. See *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) (8 U.S.C. § 1252(g) is narrow); *Arce v. United States*, 899 F.3d 796, 800-01 (9th Cir. 2018) (8 U.S.C. § 1252(g) does not bar review where the government lacks discretion to remove unlawfully).

What Respondents label 'execution' is not execution of the only country-specific order in this case. It is a separate extra-order process to select Cameroon, rely on blanket assurances, cancel individualized screening, transfer Petitioner away from counsel and the Court, and deliver him to a third country outside the removal proceedings that produced the Rwanda order. That process is the thing challenged here. It is not shielded by 8 U.S.C. § 1252(g) merely because Respondents intend to use it to accomplish a physical expulsion.

**IV. Respondents' reading of the jurisdictional statutes would create a serious Suspension Clause problem.**

The Court need not reach the constitutional question because the statutes can and should be read narrowly. But Respondents' construction would raise a serious Suspension Clause problem. Habeas exists, at its historical core, to test the legality of executive detention and to secure release from unlawful custody. *Boumediene v. Bush*, 553 U.S. 723, 779 (2008); *INS v. St. Cyr*, 533 U.S. 289, 300-05 (2001); *Goncalves v. Reno*, 144 F.3d 110, 122-23 (1st Cir. 1998). Congress must speak clearly to repeal habeas jurisdiction, and where a narrower reading avoids serious constitutional questions, courts adopt it. *St. Cyr*, 533 U.S. at 299-300; *Demore v. Kim*, 538 U.S. 510, 517 (2003).

Mr. Misigaro is not seeking lawful status. He is not asking this Court to adjudicate his asylum application, grant withholding, or review the Immigration Judge's Rwanda order. He is in physical custody under color of federal authority and challenges that custody as unlawful. He also challenges policies intertwined with that custody because those policies prevent him from seeking humanitarian protection in the ordinary course and from defending rights secured by treaties, U.S. law, and international law before the government places him beyond meaningful review.

There is no adequate substitute if this Court lacks jurisdiction. A petition for review is unavailable because there is no final order designating Cameroon. The Rwanda order could not have presented the Cameroon claim. A motion to reopen is not an adequate substitute if ICE may remove Mr. Misigaro before it is adjudicated, particularly after ICE requested cancellation of the fear interview and has announced a near-immediate charter removal. Post-removal litigation is not adequate either. *D.A.* shows why. Once the person is delivered to a foreign sovereign, the government's position becomes that the United States cannot control what happens next and the district court's ability to redress the violation may disappear.

Under Respondents' theory, the more unlawful and faster the Executive acts, the less review is available. ICE could transform every detention and third-country-removal claim into an unreviewable 'execution' decision simply by announcing a flight. That reading would make the legality of executive detention and refoulement-tainted removal depend on the speed of transport. The Suspension Clause forbids such a trapdoor. At minimum, it requires this Court to construe 8 U.S.C. § 1252(g), 8 U.S.C. § 1252(b)(9), and related provisions not to bar a habeas court from reviewing the legality of detention and preserving its jurisdiction long enough to decide the case.

**V. Interim relief is necessary because Petitioner remains in the United States and this Court can still prevent the harm that *D.A.* could not undo.**

The urgency is not speculative. Respondents notified the Court that ICE intends to transfer Mr. Misigaro outside New Hampshire and the First Circuit to effectuate removal, and that it must do so no later than April 27, 2026 to place him on an April 28 charter to Cameroon. Anzelmo Decl. ¶¶ 20, 23. If that occurs, Mr. Misigaro faces immediate loss of counsel access, loss of this Court's practical ability to supervise custody, and removal to a country where new evidence shows protected deportees are detained, pressured toward return, and hidden from meaningful scrutiny.

The relief requested is narrow and individual. Mr. Misigaro asks the Court to preserve the status quo, maintain its existing order barring transfer outside the First Circuit, prevent removal to Cameroon or any other third country unless and until Respondents provide lawful individualized process, and order release under the February 6 Order of Supervision unless Respondents can establish lawful detention. This does not invalidate a statute or enjoin the operation of 8 U.S.C. § 1231, 8 U.S.C. § 1252, or any other immigration statute on a classwide basis. It preserves one petitioner's habeas case and prevents the government from mooting it by removing him through the challenged process.

The balance of equities and public interest favor relief. The government has no legitimate interest in unlawful detention or unlawful removal. The public has a strong interest in compliance with court orders, treaties, statutes, and the Constitution. Respondents' administrative burden is minimal: they may continue supervision, provide meaningful written notice to Mr. Misigaro and counsel, conduct a counsel-assisted fear screening, allow adequate preparation time, permit review and reopening procedures, and disclose the basis for their Cameroon designation and cancellation of the interview. By contrast, the harm to Mr. Misigaro is irreparable: detention, transfer far from counsel and the Court, removal to Cameroon, possible detention there, and chain refoulement or exposure to Rwandan state actors.

*D.A.* is the cautionary lesson. The court there saw a pattern of removals to third countries where people had no ties and no meaningful notice, recognized the grave risk that assurances would not prevent onward return, and still concluded its hands were tied because the plaintiffs had already been moved abroad and the requested relief implicated a foreign sovereign. This Court can avoid that result because Mr. Misigaro remains in the United States, in federal custody, within this Court's habeas jurisdiction, and under an existing interim order. The law does not require the Court to wait until its hands are tied.

**CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court, grant the relief requested in the Amended Petition,

Dated: April 26, 2026

Respectfully submitted,

/s/ Carl H. Hurvich
Carl H. Hurvich, Esq.
Brooks Law Firm
10 High Street, Suite 3

Medford, MA 02155
(617) 245-8090
Carl@Brookslawfirm.com
BBO #698179
Counsel for Petitioner Olivier Misigaro

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2026, this document was filed through the Court's

CM/ECF system, which will send notice to all counsel of record.

/s/ Carl Hurvich